In that case, the appellant is participating by Zoom. Ms. Olson, can you hear me? I can. Sounds great. I can hear you too. Please proceed. Good morning. Catherine Olson on behalf of Appellant Steel River Systems, LLC. May it please the Court. The primary question in this case is whether the District Court erred in concluding on a motion to dismiss that collections paid to appellee lenders after initial 15% return did not constitute interest as a matter of law under New York's criminal usury statute. Under binding legal authority, the clear answer to that question is yes. Specifically, the District Court's ruling conflicts with established law regarding valuation of contingent property as interest, which comes from New York's highest court in Adair Bays. In concluding that the value of the contracted for additional return could not have been reasonably determined at the time of contracting, the District Court overlooked Adair Bays' explicit reasoning that because a usurer usually seeks to conceal usury and accomplish that purpose through increasingly novel and indirect methods, questions directed to whether a transaction is a cover for usury are typically questions of fact. You're not then disagreeing that Adair Bays says that we take account of consideration that can be reasonably valued at the time of contracting. I do not dispute that. In fact, there is no dispute by the District Court, the parties, anyone. Is that a question here, whether these portfolios could be reasonably valued at the time of contracting? That is the very question. And Adair Bays says that that is typically a question of fact. And that is where I believe that the District Court and also appellees get it wrong. Basically, the test of the dismissal state is not the likelihood of success by plaintiff or whether defendant's position is more plausible. Rather, the question specific to this case is whether the pre-transaction reflecting returns to lenders in excess of 25 percent gave rise to the plausible inference that the loans may be criminally usurious. Nonetheless, both the District Court and appellees are of the position that Adair Bays did not overrule prior decisions that contingency payments, which by their very nature are not payable absolutely, do not constitute interest. Instead, they reason Adair Bays only ever held that floating price conversion options specifically are includible as interest to the extent they can be reasonably determined. This position simply cannot be reconciled with the plain language of Adair Bays, which opines that usury laws are implicated when a lender stipulates for a contingent benefit that if exercised or triggered, has the potential to cause interest to accrue in amounts greater than the legal limit. In other words, contrary to both the District Court's finding and appellee's arguments, payment does not have to be absolute to qualify, nor are qualifying contingency payments limited to stock conversion options. Rather, under New York law, if a lender will receive something of value in exchange for a loan based on a contingency, that contingent payment may constitute interest for purposes of the usury statute. Let me ask you this question. You said that the parties at the time of contracting estimated the returns to the lenders. I see on the allegation is that before I joined the contract, the parties shared projections about what they believed total collections would be on various portfolios. Those projections as to total collections, that would be before the waterfall distribution, wouldn't it not? That is correct. So the first allegation, I believe, is that paragraph 34. That would be a return to lender until you got to the bottom of the waterfall. That is true. However, the allegations say that the parties made projections of gross collections pre-transaction. The next allegation says those gross projections reflected a return to lenders exceeding 25%. It is specifically alleged that not just gross collections exceeded 25%, but that when we take that waterfall structure, which you have to use gross projections as the first number, right? And then you step through each waterfall structure. Based on that waterfall structure, what the projection showed was that lenders would get more than 25%. So I do believe it is specifically alleged in the complaint between paragraphs 34, 35, and then paragraph 46, which specifically mentions the return to lenders, not just gross collections. I know that the complaint was made, and I disagree with it, because it wasn't specifically alleged that gross collections exceeded 25%. It was saying when you take these gross collections and then you look at the waterfall structure, that eventually resulted in additional returns exceeding 25%. Thank you. Here, neither the district court nor appellees can test that the additional return has value. Rather, they dismiss that value as far too speculative or uncertain to qualify as interest. Adder Bayes plainly rejects this conclusion by explaining that technical concerns regarding valuation methods and the certainty of contingent property should not facilitate evasion of the usury laws. For example, Adder Bayes cites Hartley v. Eagle, where payments were based on life expectancy, and explains that notwithstanding the perceived uncertainty in such areas, it, too, came down to the fact-finding regarding valuation methods. Adder Bayes even explicitly warned against courts relying on their own difficulties in imagining how valuations could be carried out for a given contingency when assessing usury. Notwithstanding this warning and cited examples in Adder Bayes, which went beyond conversion options, the district court here specifically made assumptions that the existence of reasonable valuation methods in the industry of debt buying and debt collection for purposes of concluding as a matter of law that the additional return could never qualify as interest. In doing so, the district court usurped the fact-finding role and allowed the novel form in which the usury appears in this case to facilitate evasion of the usury laws. This constitutes clear error under Adder Bayes. To this point, it is worth noting that the alleged projections are not the only valuation method that may be revealed through discovery. Expert discovery and additional internal valuations from appellees themselves may be revealed, each of which could be relied upon by a jury to construct a reasonable valuation. Valuations are obviously crucial to secure lending in any form as they ensure that the property or asset being purchased constitutes sufficient collateral. Notwithstanding this, appellees would have this court believe that they lent millions of dollars with repayment terms on the ability to collect upon the receivable as collateral without ever undertaking any reasonable valuation of potential collection returns. This defies logic. No reasonable lender would proceed in such a fashion. And in any case, inciting with appellees' position that no reasonable mechanism exists, which inevitably involves speculation on the district court's part, the district court acted in contradiction to the clear holdings of Adder Bayes. Both below and on appeal, appellees also cited their alternative unsupported interpretation of the alleged pre-transaction projections in events as evidence supporting dismissal. It is established law, however, that you cannot go outside the pleadings on a motion to dismiss without converting it to a motion for summary judgment. And as here, the motion was never converted to one for summary judgment. Matters outside the pleadings cannot sustain dismissal. And that ends my time now. I'll reserve the remaining time for rebuttal. Thank you. Thank you. We'll hear from the appellee. Good morning. May it please the Court. My name is Mark Rosen from Kleinberg Kaplan with McCone. I represent the two appellees, Variant and Peer. Clearly, plaintiff, a professional debt collector, is eager to avoid repaying the loans he borrowed. The fundamental flaw with plaintiff's argument is that we have a loan agreement, and not written on the back of a cocktail napkin, where as a matter of law, according to SRS, the debt receivables are uncollectible. Judgment-proof debtors never paid. Creditors couldn't collect. And according to SRS, they are literally uncollectible. According to the Waterfall Payment Structure, first SRS gets paid millions of dollars. Then expenses get reimbursed. Then the loan manager gets paid its management fee. Then my client gets 7.25% interest, clearly below the civil usury threshold. Only then, if there were enough gross receivables that could make their way down the waterfall, would my client get paid. And not that this is dispositive, but given that my client has not absolutely repaid the loan, there's no absolute repayment obligation, and it's inherently uncertain. But to hear you suggest that your client decided to throw its money away, your adversary says that no one in his right mind, no reasonable lender, would lend these sums without some estimates. Estimates as to how much they're going to recoup and at what interest rates. I mean, I hear you that these are deadbeat loans, but that doesn't mean that you can't squeeze water out of it. If we're just squeezing water out of it, I would argue that's inherently uncertain. But to answer your specific question, Your Honor, we are obligated to get our principal back. We are obligated to get our interest back. We didn't give away this money. So because my client has a lottery ticket, a profit share with SRS, who, by the way, SRS, the borrower, unlike an 8-hour base, is solely responsible for collecting these receivables. So an SRS is responsible for performing the contingency. These are impossible to value. These are not receivables, all unlike 8-hour bay, where the lender controlled the option, where according to the court of appeals, despite the name, floating-price conversion options are actually very easy to value because they're based on the stock price of a publicly traded company. Well, doesn't the lender control the option here? And the borrower doesn't get to say, well, I think I choose not to pay you the additional preferred return. I prefer to repay principal and interest and call it a day. That's not an option. This isn't like Sumner or something, where the buyer had the — I'm sorry, the lender had the opportunity to avoid the bigger contingent downside or upside, depending on which side of the transaction you're on, by repaying. I don't understand what the relevance is of who controls the collection. Sure. The borrower purchased these receivables and is 100 percent responsible for collecting. The borrower decides who to go after, how to go after them, not the lender. So if he's been sitting on his hands for years, we won't get any money, and what a coincidence, we haven't gotten any money. So it's not really appropriate to liken this to 8-hour bays. So in Deal, do you think this Deal v. Becker case has been overruled? That's the one where the — in addition to repayment, if you sell your patent rights, we get a share of that? Yeah. If I recall, that case was from the year — 1919. 1919. Very old case. It's been overruled. I don't care how old it is. I want to know if it's overruled. It certainly hasn't been followed in 100 years, and it's also very distinguishable because the lender in that case had the right to sell the patents after five years. I still don't get to collect on the receivables, my client. So we are not in the same position as that case. How about Brown v. Vertebrate? Even older. Is it still good law? That's the one where, in addition to the repayment, if the company does not as well, something that's completely in the control of the borrower, the lender can opt to get a share of the company. Yeah. I would say all of these cases are consistent in that the payment obligation has to be concrete. It has to be some regularity. There has to be an absolute repayment obligation, and the borrower can't control the contingency. If all those things are taking place, like here, it is not usury because it's not interest. Well, but in Brown, the borrower controlled how well the company did, which I think is the analogy to the collections here. But the borrower didn't have the option to avoid the seller opting to take a share of the company, right? And the fact that the borrower was sort of the one whose conduct generated the return or not didn't defeat the notion that it wasn't usury per se. You still had to figure out the value and figure out whether the value exceeded the threshold. But I'm just trying to figure out whether this notion about the lender controlling things is even relevant as a factor here, or whether this is really about whether it can be valued. Yeah. I think it is. There are four arguments. One is it's inherently uncertain. We have uncollectible debt, which is not. No, I know your point. I'm just trying to figure out whether you really only have one argument. I feel like they're different sides of the same coin, because when you put it, as Adar Bey said, when there's significant market risk, it's more likely you're not a lender. Here, we have uncollectible debt. Millions first go to the plaintiff. We're not guaranteed to be paid. Well, wait a minute. Your loan is not only secured by the debt portfolios that are being purchased, but also by any other future intangibles of the lender. And you've got essentially an attachment until your 15 percent is recovered. That doesn't feel like a huge downside risk compared to the upside gain that you're bargaining for. These are uncollectible debt. The plaintiff breached years ago. It seems like a big market risk. When you say there's uncollectible debt, your client chose to spend money gambling on the collectibility to some extent of funds from his uncollectible debts. Am I misunderstanding how this transaction worked? No, Your Honor. And the plaintiff entered into the same transaction who's a professional debt collector. So it's understood that there was some collectibility to the debt, even if it was written off by the prior debt holders, I assume. I will concede that inherently uncertain debt that cannot be valued, some of it comes in. You say it can't be valued, but your folks are professionals. Are you telling me that they never tried to make an assessment of what they thought the return would be on their investments when they made this investment? As far as I can tell, they have not. They relied solely. Plaintiff, a little disingenuous Not plaintiff's counsel. Plaintiff disingenuously keeps referring to the parties exchanging projections. Even on page 25 of their brief, they admit that their client solely created and sent around. Okay, so the follow-up question is Self-serving projections, by the way. Self-serving projections. Yes. But it sounds like your client chose to rely on those. Maybe it didn't do its own separate projections. Why doesn't that at least suggest there's value there? Whatever it is, one can litigate, one can develop a record and have evidence, but there's value there. I don't know if that means to say there's value when you can't reasonably determine it at the time of the contract. How do we know that? We're at the pleading stage. And we've got, I mean, how is this different from Adder Bayes where there was contingency and you don't know what the price is at which they're going to, you know, whether they're going to convert and what it's going to look like? Because in Adder Bayes, the contingency belonged to the lender and they were easy-to-value instruments. Here, they are very difficult-to-value, if not impossible. During COVID, people aren't paying their bills. That's what gets – what a surprise. The plaintiff defaulted pretty quickly in this matter. It is important – it's not – just because money can come in, that doesn't mean it's not inherently uncertain. Just because my client and the plaintiff did a profit share, agreeing to take a lottery ticket on top of principal and interest, that doesn't mean that my client is engaging in notorious activities with respect to a professional debt collector who knows more about this than all the parties. But how – just on this question about pleading stage, how do we determine – how is it proper for that determination to be made at the pleading stage? The part – the court should review the 58-page loan agreement that says the debt receivables are uncollectible, read the waterfall, which shows that a lot of – most of the vast majority of the money goes to plaintiff and other non-usurious buckets, even before it would get to the additional preferred return. Which is why there's significant market risk, which is why my client's been chasing this money for years. We'll hear rebuttal. Thank you, Your Honor. Thank you. So here, I think both – all of the judges relate, but Judge Jacobs, I think you hit the nail on the head when you said – questioned their characterization that this is uncollectible debt and how absurd that sounds from an experienced lender who's giving out millions of dollars here. Also, Judge Robinson, I think, really touched on the main issue here in questioning a police position regarding the control issue here and pointing out deals specifically. Ad Arbeis cites the deal as still good law. So I do not believe that it has been overruled. It is still good law. And, in fact, I think Ad Arbeis was merely clarifying that we have had this case law for 100-plus years and the courts have been getting it wrong. And so they took the opportunity to clarify and say, hey, contingency payments are includable as interest if they can be reasonably valued. Going to the valuation questions here, I think it's really important to point out that Appellee's own demand to cure the default identified additional return projections and demanded prepayment of the additional return at a discount to cure the purported defaults and avoid the sale of collateral. This communication tends to confirm Appellant's position that, far from being an unlikely and speculative return, Appellee is at all times expected to receive the additional return and even relied upon projection metrics for purposes of establishing the value of those returns. Can you just briefly, sorry, before your time is up, because one of the challenges here is we've got these sophisticated commercial folks entering into the transaction. It does feel a little odd now to come back and say this wasn't a fair transaction. And I'm wondering how you address the notion that the statute only applies for loans less than $2.5 million, and I understand no individual installment triggered that. But why shouldn't we view this as a collective whole that takes you out of the statute altogether? Yes, so I believe there are two points of law that are controlling on this issue and show that it doesn't satisfy this $2.5 million threshold. First, the statute by its plain language directs us to look at the written agreement and see what the total agreed amount is. Second, usury is analyzed at loan inception. Thus, a note that is void at inception for usury continues void forever, whatever its subsequent history. Here, the loan and servicing agreement does not reflect any agreement to make loans totaling $2.5 million or more. To the contrary, the agreement specifically states that nothing therein commits or requires lenders to advance any other amounts beyond the initial loan. So once the second installment is made and you're up over $2.5 million, why shouldn't we look at that cumulatively? So again, I think it's because the law says you have to look at inception. At inception, there was no additional loans. Months down the line, yes, after the fact, they subjected that loan to the loan and servicing agreement. However, per the loan and servicing agreement, each loan was subject to its own approval situation. This was not a situation where we had one loan agreement that said, I will give you installments up to $3 million, $4 million, $5 million. It said, we're going to loan you $2.4 plus million under the $2.5 million threshold. And if we lend you more, we would include these terms as part of that. However, we're not agreeing to do that, and any additional loan would have to go through an approval process all on its own. So I think if you were to apply this $2.5 million threshold, there's a couple problems. First, you would be speculating and assuming that an additional loan would definitely happen and that that loan would take the amount over the $2.5 million. Additionally, I think it would be establishing a bad precedent here because the usury laws would be substantially weakened if lenders could combine multiple individually usurious loans months or even years after the fact, as occurred here, simply by incorporating terms of an earlier loan agreement. So if that answered your question, I would say just in conclusion, for the reasons stated today and in the appellant's briefing, appellant respectfully requests that the court reverse the dismissal of appellant's second cause of action brought under Section 9-625A of the New York Uniform Commercial Code, reverse the denial of appellant's motion for preliminary injunction, and remand the case for further proceedings. Thank you so much. Thank you both, and we will take the matter under advisement.